UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

-------------------------------------------------------------------------

/

PAT PORTINGA,                                  |        Case No. #1:07-cv-1208

|

Plaintiff,                       |        Honorable Paul L. Maloney

|

v.                             |        Magistrate Judge Carmody

|

NORMAN TAYLOR, Superintendent of the           |
Constantine Public Schools, in his individual capacity,   |

|

Defendants.                     |

|

-------------------------------------------------------------------------

**Opinion and Order**

**Granting the Defendant's Motion for Summary Judgment;
Terminating and Closing the Case**

Plaintiff Pat Portinga ("Portinga") was employed by the Constantine Public Schools ("the school") as an Accounts Payable / Payroll Clerk from April 2002 until her termination in April 2006. *See* First Amended Complaint filed April 22, 2008 ("Am Comp") ¶¶ 7-8; Defendant's Answer to the First Amended Complaint ("Ans") ¶ 8.

It is undisputed that Portinga was an at-will employee at all times during her employment for the school district, as she acknowledged expressly in each year's contract, and was not covered by any collective bargaining agreement. *See* MSJ, Ex A ("Supplementary Contracts" signed by Portinga and dated August 15, 2005 and October 12, 2004 and July 23, 2003). Taylor states that the school board had authorized the Superintendent, then defendant Norm Taylor ("Taylor"),[1] to hire

------

[1]

Portinga points out that Taylor left his position as Superintendent in January 2008. Relying

and fire clerical staff, such as Portinga, at his discretion,[2] and she agrees.  *See* Plaintiff's Brief in

Opposition to the Motion for Summary Judgment ("P's Opp") at 1 ("He has complete authority to

terminate Plaintiff's employment.") (citations omitted).

Portinga brings this 42 U.S.C. § 1983 action claiming that the school terminated her without

warning, and without an opportunity to correct any performance deficiencies, in violation of her

First Amendment rights to freedom of speech and freedom of association, *see* Am Comp ¶ 1, and

the court has federal-question jurisdiction under 28 U.S.C. § 1331 and Article III, section 2, Clause

1 of the U.S. Constitution.  *See Fieger v. Michigan S. Ct.*, 553 F.3d 955, 960 (6th Cir. 2009) (Griffin,

J.) ("Art. III, § 2, cl. 1 provides:  'The Judicial Power shall extend to all Cases, in Law and Equity,

arising under this Constitution, the Laws of the United States . . . .'").  Portinga seeks compensation

for loss of income, loss of health insurance and dental insurance benefits, loss of retirement benefits,

and emotional distress, and reimbursement of attorney fees.  Am Comp ¶ 20.

Throughout Portinga's four years as a clerk, she received formal performance reviews, and

informal comments from the school, acknowledging that her performance was exceptional.  Am

Comp ¶ 9.  For example, just eight months before Portinga's termination, she received an annual

---

on deposition testimony from a board member, she alleges that Taylor's "performance in the eyes
of the Board was, over the years, becoming less favorable" and "[i]t was apparent that his contract
would not be renewed."  P's Opp at 1-2 (citing Ex T (Bergh Dep) at 65 to 66).  But the Board's
perception of Taylor's performance, and Taylor's reasons for leaving, are irrelevant to the questions
at hand on this summary judgment motion:  has Portinga shown a genuine issue as to the elements
of her First Amendment retaliation claim, and has she shown that Taylor is not entitled to qualified
official immunity?  Portinga's counsel does not serve his client's interests, nor enhance his own
professional reputation, by inserting irrelevant, unflattering factual allegations about her adversary.

[2]

*See* MSJ at 2, citing Ex B, Portinga Dep at 8 - 11; *id.* Ex C , Muckel Dep at 3 to 4 and 12 -
18; *id.* Ex D, Bergh Dep at 84 through 86; *id.* Ex E, Davidhizar Dep at 3 - 5 and 6 - 14; *id.* Ex F,
Smith Dep at 3 - 11; and *id.* Ex G ("2nd Portinga Dep Excerpt") at 103 through 106.

evaluation stating that her performance "exceeds requirements" (the highest rating) for all areas except one, where she received the second-highest rating, and she was described as "a great team player and an excellent employee." *see* P's Opp Ex B, Non-Certified Staff Evaluation for Plaintiff 2004-2005, dated August 23, 2005.  At oral argument, Taylor's counsel acknowledged that Portinga's performance had been excellent until shortly before her termination.

Only a little more than two months before Taylor fired Portinga, he wrote what she calls a "glowing" letter of reference on her behalf, describing her as personable, friendly, trustworthy, hard-working, dedicated, conscientious, mature, polite, considerate, and a person of high morals and integrity. *See* P's Opp Ex C, Letter of Reference dated January 25, 2006.  Portinga also points to a praiseworthy reference letter about her from former Business Manager Bojanich, P's Opp Ex D, and favorable oral comments about her from board member Bergh, P's Opp Ex T (Bergh Dep) at 52, and teacher Dale Wentela, *id.* Ex DD (Dale Wentela Aff) ¶¶ 3 & 6.

Nonetheless, Portinga alleges, the school "abruptly" terminated her, citing as the primary reason her alleged "efforts to undermine the Superintend[e]nt [Norm Taylor], Business Manager [Lisa Pointer-Seidner,] and Building and Grounds Supervisor."  Am Comp ¶ 12.

Portinga alleges that Taylor's primary motivation for firing her was a desire to retaliate for her constitutionally protected speech and association.  Am Comp ¶¶ 18-19.  Two to three weeks before her April 17, 2006 termination, Portinga had commented critically to one or two members of the school board[3] about improper conduct by Taylor.  Am Comp ¶¶ 13-14.  Specifically, she told

---

[3]

During 2006 and at the time of her termination in April 2006, there were seven members of the Constantine Board of Education:  Jacob Bergh, Tommy Muckel, David Davidhizar, Jeffrey Zimont, Mary Smith, Susan White, and Kevin Brouse.  *See* P's Opp Ex R (Portinga Dep) at 37-38. All except White and Brouse were deposed, and excerpts of their depositions filed in connection with this motion.  The testimony of board members Zimont, Smith, White, and Brouse do not play

the board members that (1) after the school ordered table "skirting" and it arrived in the wrong color,

Taylor directed the district to order another one without returning the original, at a cost of $1,600,[4]

when he was refusing to authorize the purchase of needed instructional supplies, such as textbooks

for a high school physics class;[5] (2) Taylor went online during work hours to purchase baseball

tickets, and would schedule blocks of time for this purpose when he would be "unavailable"; (3)

Taylor arranged for a pay advance to supplement his Health Savings Account;[6] (4) Taylor officiated

---

much of a role in the court's analysis, because Portinga has not alleged that she made constitutionally-protected statements to those four board members.

[4]

Taylor explains that the school paid about $800 – not $1,600 – for *two* sets of table skirting; that the school's decision not to return the first table skirt was motivated by the supplier's statement that it would charge a significant return fee; and that the unused skirt was not discarded or left unused but given to the elementary school, which also needed a table skirt for its meetings. *See* MSJ at 3 n.1, citing Ex I . The cited exhibit, however, is only an invoice for the two table skirts; the defendant does not cite deposition testimony or an affidavit to support its other factual assertions on this issue, and the statements of counsel are not competent evidence.  In any event, because Portinga is opposing summary judgment, the court is obliged to accept all of her well-pleaded factual allegations and construe the facts in the light most favorable to her.

[5]

Taylor emphasizes Portinga's testimony that she was concerned about this issue because her daughter was taking a physics class and there was no textbook, MSJ at 3 n.2, in an attempt to show that her comment to board member Bergh on that issue addressed primarily a matter of personal concern, not public concern.  Taylor also points to Portinga's testimony that she knew that textbooks came from a separate, different budget than the school board's purchases such as the table skirts, that the high school principal would be the one responsible for ordering physics textbooks, and that she did not know whether anyone had asked Superintendent Taylor about ordering physics textbooks. *See* MSJ at 3 n.2, citing Ex G (Second Portinga Dep Excerpt) at pp. 41-50.

At oral argument, Portinga's counsel pointed to paragraph ten of the Bergh affidavit for the allegation that Bergh raised the table-skirt issue "either" one-on-one with Taylor or at a meeting with others present.  During the hearing, defense counsel responded that Bergh never stated that he linked the table-skirt spending to the alleged insufficiency of funds to buy textbooks.

[6]

Portinga testified that Taylor's pay advance was made necessary by a change in the school district's healthcare-insurance coverage for administrators, that she knew at least one other employee who had obtained the same type of pay advance, that as far as she knew *any* administrator

-4-

at sporting events during school hours, earning fees in addition to his regular salary as superintendent. Am Comp ¶ 15. At an unspecified "earlier" time, Portinga supposedly made other critical comments to school board members about Taylor's performance as superintendent, including the allegation that he was too frequently absent from work, Am Comp ¶ 16, but she ultimately fails to show a genuine issue as to whether she made any arguably-protected comments about Taylor to any board member other than Jacob Bergh. Portinga alleges that after she informed board members about the expenditure on table skirting, one or more questioned Taylor about it. Am Comp ¶ 17.

**Notwithstanding the allegations of Portinga's complaint suggesting that she complained about Taylor to more than one board member, her deposition testimony and her interrogatory answers both state that she complained *only to board member Bergh* about three issues: the table skirts, Taylor's alleged use of his work computer and working hours to purchase baseball tickets for his personal use, and Taylor's receipt of a pay advance.** *See* Plaintiff's Answers to First Set of Interrogatories and Requests to Produce, dated April 21, 2008 ("P's Rog Ans"), Answer No. 3 (stating that comments in Am Comp ¶ 15a, ¶ 15b, and ¶ 15c were directed at "Jake Bergh"). For his part, board member Muckel testified that he did not recall Portinga making negative comments to him about the table skirts or baseball tickets prior to her termination. *See* MSJ, Ex C (Muckel Dep) 16:20 to 17:5.

**As for Portinga's complaint about Taylor's officiating of high-school athletic events,** her interrogatory answers state that she directed that complaint to "Jake Bergh *and* [fellow board

---

who wanted such a pay advance could obtain one, that the advance to Taylor was recouped by deduction from his subsequent paychecks, and that she did not believe that his advance was inappropriate. *See* MSJ Ex G (Second Portinga Dep Excerpt) at pp. 58-63. Portinga also testified that while she said something to board member Bergh about Taylor's pay advance, she did not recall telling Bergh that she considered the advance inappropriate. *See id.* at 62-63.

member] Tom Muckel", *see* P's Rog Ans. No. 3 (emphasis added), but Muckel testified at deposition that he did not recall "her negative comments about Mr. Taylor being out of the office refereeing at sporting events." *See* MSJ Ex C (Muckel Dep) 17:6-9.  And at Portinga's own deposition, she began by claiming that she complained to both Bergh *and* Muckel about Taylor's officiating, *see* MSJ, Ex G (Portinga Dep) 64:21-25, but when asked just a minute later, "did you complain to Mr. Muckel about that issue?", she responded simply "No." *Id.* 65:3 to 66:3.  Portinga then explained that Muckel knew about Taylor's officiating because Muckel too officiated some games and was "a partner with Mr. Taylor as an official," and she stated that she did not specifically tell Muckel she thought Taylor's officiating was inappropriate. *Id.* 66:4-14.

More broadly, later in Portinga's deposition, counsel asked "Is there any other reason that you're alleging that Mr. Taylor terminated your employment other than your conversations or the things that you told Mr. Bergh and Mr. Muckel?", and she responded, "No." Ex G at p. 89-90.

The court adopts Portinga's deposition testimony as factually true for purposes of this summary-judgment motion, not any contradictory allegations in her amended complaint. *See Leary v. Livingston Cty.*, 528 F.3d 438 (6th Cir. 2008) (Sutton, J., joined by McKeague, J., with Clay dissenting o.g.) ("When a claimant's testimony contradicts the allegations in his complaint, we will credit his later testimony.") (citing, *inter alia*, *Wysong v. City of Heath*, 260 F. App'x 848, 857 (6th Cir. 2008)).[7] **This court cannot permit a jury to find, per Portinga's complaint, that she spoke to people in addition to Bergh about the table skirts, the baseball tickets, or Taylor's**

---

[7]

*Cf. Scott v. Metro. Health Corp.*, 234 F. App'x 341, 365 (6th Cir. 2007) (Griffin, J.) ("It was eminently reasonable for the judge to look skeptically at Scott's claim that she met with Faas about vascular study payments and lack of written orders, *given that the claim contradicted her deposition testimony*.") (emphasis added), *cert. denied*, – U.S. –, 128 S.Ct. 1225 (2008).

**officiating, when she testified otherwise.** *See Stegall v. Audette*, 212 F. App'x 402, 405 (6th Cir. 2006) (Daughtrey, Cole, <u>C.I.T. J. Restani</u>) ("Stegall's own testimony and her complaint to the police contradict the inference she would ask the jury to draw. * * * Consequently, we find that no reasonable jury could infer from the evidence on the record that Mott attacked Stegall.").

At deposition, Portinga admitted that she did not know whether board member Bergh ever spoke to Taylor about Portinga's complaints regarding the table skirts, the baseball tickets, and Taylor's pay advance. *See* Ex G (Second Portinga Dep Excerpt) at pp. 50 and 57-58 and 62-63.

Taylor agrees that "[o]ne of the reasons why Plaintiff was terminated" was that she "engaged in efforts to undermine the Superintendent, Business Manager[,] and Building Grounds Supervisor, resulting in a loss of trust and lack of confidence in her responsibilities." Ans ¶ 12. Taylor alleges that the other reasons for the decision were those stated in Portinga's termination letter: "negative attitude, unauthorized reduction of staff pay without administrative approval; questioning and second guessing beyond Plaintiff's responsibilities, properly administrative[ly] approved invoices and timesheets; [and] violation of the office compensatory time procedures." Ans ¶ 12 & Ex 1.

Taylor observes that Portinga's "attitude seemed to deteriorate after she was passed over for promotion to Business Manager and her husband's application for the Buildings and Grounds Supervisor's position was denied." Defendant's Motion for Summary Judgment filed November 3, 2008 ("MSJ") at 5. Portinga's immediate supervisor from January 2006 until her termination, Business Manager Lisa Pointer-Seidner, remembered Portinga saying that she did not like the man who was hired as Building and Grounds Supervisor instead of her husband and made negative comments about his performance, and that the atmosphere in the central office improved after her termination. MSJ Ex H (Seidner Dep) at pp. 54 and 80. Portinga responds that while she was

-7-

disappointed with the decision to hire Seidner instead of her as the new business manager, she "was not bitter or angry about not getting the position."  P's Opp Ex R (Portinga Dep) at 78-79.

Seidner testified that Portinga was uncooperative, made it difficult for her to find files needed to do her job, and misled her regarding the procedures needed to obtain access to the School Finance software, which delayed her acquisition of needed information for two weeks, *see* MSJ Ex H (Seidner Dep) at pp. 5 through 25 and 36 to 37, but Portinga denies this, *see* P's Opp Ex R (Portinga Dep) at 80 and Ex BB (Portinga Aff.) ¶¶ 2-4.  Portinga points to the testimony of Julie Lorenz, who worked alongside her and Seidner on a daily basis.  Lorenz testified that she considered Portinga a good, competent worker, pleasant to work with, and that she did an "excellent" job, *see* P's Opp Ex Y (Lorenz Dep) 12:11 to 13:4; that she was not aware of any problems between Portinga and Seidner, *id.* 13:12-14, and that there were more overpayments and other payroll problems in the central office at the time of her deposition than when Portinga was working there, *id.* 13:16 to 15:19.

Seidner also testified that board member Muckel reported to her that Portinga was telling other people that Seidner was incompetent.  MSJ Ex H (Seidner Dep) at pp. 19 through 21.

Seidner further testified that Portinga had made unprofessional comments to her about Superintendent Taylor, making clear that she did not respect him.  MSJ Ex H (Seidner Dep) at pp. 37 through 44.  Seidner recalled that Portinga disobeyed a direct order from the superintendent *not* to reduce a teacher's pay due to excessive sick leave time.  MSJ Ex H (Seidner Dep) at pp. 8 through 11, 55 through 58, and 74 through 80.  But Portinga denies ever being told not to reduce that teacher (Sue Lowler)'s pay for being absent after she had exhausted her sick time, *see* P's Opp at 14 citing Ex R (Portinga Dep) at pp. 93 thru 100, and she alleges that the Board had just instituted a new policy rejecting requests to refrain from docking pay for absences beyond allotted sick time, *see* P's

Opp at 15-16 (citations to the record omitted).  The court must accept Portinga's version of events as true, so long as it is internally consistent and not contradicted by her own evidence, while she is opposing summary judgment.

In addition, Seidner testified that Portinga abused the school district's compensatory-time ("comp time") policy, using 32 hours of comp time to avoid using vacation days in late March to early April 2006, and recording comp time for overtime when Seidner had not approved an award of comp time as required by school policy.  When Seidner questioned Portinga, she responded that approving and recording comp time was *her* responsibility, notwithstanding the school policy expressly stating that an award of comp time required pre-approval from the business manager.  MSJ Ex H (Seidner Dep) at pp. 11-13, 16, 38 and 49 to 50.  Portinga denies these accusations by Seidner, and points to the deposition testimony of Julie Lorenz, "who worked side by side with Plaintiff and Ms. Pointer-Seidner on a daily basis."  P's Opp at 4, citing Ex Y (Lorenz Dep) at p. 13.  Portinga alleges that Seidner approved that comp time request, and she points to Seidner's testimony, upon seeing the approval document, that she had indeed approved it.  *See* P's Opp Ex P (Portinga Payroll Timesheet for Mar. 27, 2006 - Apr. 9, 2006) and Ex AA (Seidner Dep) at 13 and 46 to 47.  Portinga also maintains that even if Seidner had not approved her request for comp time to cover that period of absence instead of vacation time, she had sufficient unused vacation time to cover the absences anyway.  P's Opp at 17, citing x Q (Portinga Direct-Deposit Pay Report).  The court, of course, accepts Portinga's well-pled factual allegations as true for purposes of this summary-judgment motion (except where, as discussed below, her deposition testimony contradicts her amended complaint).[8]

_____

[8]

Portinga charges that "the testimony of Ms. Pointer-Seidner, an obvious supporter of

According to Portinga, numerous school board members were surprised that Taylor fired Portinga, and she presents testimony to that effect. *See* P's Opp, citing Ex U (Davidhizar Dep) at 12; *id.* Ex V (Zimont Dep) at pp. 6 to 7; *id.* Ex W (Smith Dep) at p. 9.

Finally, both in her opposition brief and at oral argument, Portinga emphasizes the undisputed fact that Taylor had expressed concerns about his staff's loyalty, and that sometime shortly after Taylor fired her, he told Lorenz that if "things . . . were to happen in the future that were not appropriate in the office that, you know, I'd have people in the office that I felt we could trust and do a good job and follow procedures." P's Opp at 7-8 (quoting Ex S, Taylor Dep, at 77). Lorenz testified that Taylor told her that he had fired Portinga because of loyalty issues and insubordination. P's Opp Ex Y (Lorenz Dep) 15:20 to 16:13. "A couple of months later, around June of 2006," P's Opp at 8, Taylor asked Lorenz whether she was reporting his whereabouts and schedule to people, noted that his office was fairly sound-proof, stated that he was concerned because in the past "details of his calendar had gotten out", and asked Lorenz for assurance that she would not repeat things outside of the office. P's Opp at 8, citing Ex Y (Lorenz Dep) at 17-18 &

───────────────

Defendant, is dubious because of testimonial inconsistencies . . . ." P's Opp at 5. The only alleged internal inconsistency in Seidner's testimony is that she "did not recall that she had approved Plaintiff's comp time leave." P's Opp at 5 n.1, citing Ex AA, Seidner Dep., p. 13. "She was forced to recant that testimony when shown the relevant exhibit, which reveals her signature approving the comp time leave." *Id.*, citing Seidner Dep., pp. 46-47.

The court cannot hold, as a matter of law, that Seidner was lying when she initially testified that she did not remember approving Portinga's comp time. "'This boils down to a credibility determination, the very type of determination that courts may not resolve on summary judgment.'" *State Farm Fire & Cas. Co. v. Liberty Ins. Underwriters, Inc.*, 2009 WL 702863, *2 n.1 (W.D. Mich. Mar. 16, 2009) (Maloney, C.J.) (quoting *Coburn v. Rockwell Automation, Inc.*, 238 F. App'x 112, 126 (6th Cir. 2007) (Griffin, J.)); *see also Borg v. Chase Manhattan Bank USA, N.A.*, 247 F. App'x 627, 632 (6th Cir. 2007) (Griffin, J.) ("When reviewing a district court's grant of summary judgment, the appellate court may not determine the credibility of witnesses or weigh evidence.") (citing *Reeves v. Swift Trans. Co.*, 446 F.3d 637, 640 (6th Cir. 2006)).

Ex S (Taylor Dep) at 56-57.

Portinga also presents the testimony of Curriculum Director Victoria Wentela that shortly after Taylor fired Portinga, he brought up in a meeting his perception that there had been a "leak" on the office.  P's Opp at 8, citing Ex Z (Victoria Wentela Dep) at 17-18.  Victoria Wentela inferred that Taylor was referring to Portinga as the source of the leak because it was right after he had fired her.  *Id; see also* P's Opp Ex DD (*Dale* Wentela Aff.) ¶ 4 (alleging that on the day of Portinga's termination, Business Manager Seidner told him that "[i]n the best interest of the district, this office needs to have secrets.").   At oral argument, Portinga's counsel seemed to pursue the line of reasoning that because Taylor referred to a "leak" and a "mole" but fired only Portinga, she must have been the "mole" and the "leak" to which Taylor was referring in his conversations or meetings with Julie Lorenz and Victoria Wentela.

## PROCEDURAL HISTORY

Portinga filed the amended complaint (with Taylor's consent) in April 2008, and Taylor answered in May 2008.  After the close of discovery, Taylor filed the instant summary-judgment motion in November 2008; in December 2008, Portinga filed an opposition brief and Taylor filed a reply brief.  The court heard oral argument on Monday, March 23, 2009.

### LEGAL STANDARD:  Summary Judgment

Summary judgment is proper if the "'pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law."  *Patterson v. Hudson Area Schools*, 551 F.3d

438, 444 (6th Cir. Jan. 6, 2009) (quoting FED. R. CIV. P. 56(c) (2009)).[9]

The movant has the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law. *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *13 (citing *Conley*, 266 F. App'x at 404 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). However, the movant "need not support its motion with affidavits or other materials 'negating' the opponent's claim"; rather, the movant's initial burden is only to "point out to the district court that there is an absence of evidence to support the nonmoving party's case . . . ." *Wilson v. Continental Dev. Co.*, 112 F. Supp.2d 648, 654 (W.D. Mich. 1999) (Bell, J.) (citing *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993)), *aff'd o.b.*, 234 F.3d 1271, 2000 WL 1679477 (6th Cir. 2000).

Once the movant has met its burden, the non-movant must present "significant probative evidence" to demonstrate that there is more than "some metaphysical doubt as to the material facts." *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *13 (citing *Conley*, 266 F. App'x at 404 (quoting *Moore*, 8 F.3d at 339-40)). **The non-movant may not rest on the mere allegations of his pleadings.** *Griffin v. Reznick*, – F. Supp.2d –, –, 2008 WL 5110528, *3 (W.D. Mich. 2008) (Maloney, C.J.) (citing *Wilson*, 112 F. Supp.2d at 654 (citing FED. R. CIV. P. 56(e) and *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995))); *see also Transition Healthcare Assocs., Inc. v. Tri-State Health Investors, LLC*, – F. App'x –, –, 2009 WL 67869, *4 (6th Cir. Jan. 9, 2009). If the

_____

[9]

Before the December 2007 amendment, FED. R. CIV. P. 56(c) stated that summary judgment is appropriate if the "'pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *ARS, Inc. v. Consumers Energy Co.*, – F. Supp.2d –, –, 2008 WL 828112, *13 (W.D. Mich. 2008) (Maloney, J.) ("*ARS*") (quoting *Conley v. City of Findlay*, 266 F. App'x 400, 404 (6th Cir. 2008) (Griffin, J.)). The amendment was stylistic only. *Dobrowiak v. Convenient Family Dentistry, Inc.*, – F. App'x –, –, 2009 WL 537674, *3 n.4 (6th Cir. Mar. 4, 2009) (citing FED. R. CIV. P. 56(c), Adv. Comm. Notes)).

movant puts forward evidence – such as affidavits, purported business records, purported government records, etc. – the other party cannot withstand summary judgment by simply sitting mute and failing to challenge the authenticity, admissibility, or veracity of those documents.  *See, e.g., Donoho ex rel. Kemp v. Smith Cty. Bd. of Ed.*, 21 F. App'x 293, 298 (6th Cir. 2001) (Boggs, J.) (affirming summary judgment for defendant employer, Circuit noted that plaintiff's *"affidavit does nothing to challenge the evidence put forward by the defendants* that the last IEP meeting, occasioned by her complaint, also included provision to her of the apparently usual verbal and written notices of her rights.") (emphasis added).[10]

Moreover, the mere existence of an alleged factual dispute will not defeat a properly supported summary judgment motion; there be some genuine issue of *material* fact.  *ARS*, 2008 WL 828112 at *13 (citing *Conley*, 266 F. App'x at 404 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986))).  And the non-movant "cannot defeat a properly supported motion for summary judgment motion by 'simply arguing that it relies solely or in part upon credibility determinations.'"  *Heggie v. Kuzma*, 2009 WL 594908, *10 (W.D. Mich. Mar. 6, 2009) (Maloney, C.J.) (quoting *Fogerty v. MGM Group Holdings, Inc.*, 379 F.3d 348, 353 (6th Cir. 2004) (non-movant may not "have a trial on the hope that a jury may disbelieve factually uncontested proof")).

---

[10]

*See, e.g., SBA v. McDonald*, 1985 WL 13600, *1 (6th Cir. Aug. 15, 1985) (p.c.) ("Even assuming the checks and money orders were mailed, there is no genuine issue as to their receipt. McDonald offers nothing to dispute the sworn affidavit that payment was not received.  Payment does not occur without receipt.  Summary judgment was appropriate.");

*US v. One 1983 Mercedes-Benz 380SL*, 1991 WL 276262, *6 (6th Cir. Dec. 20, 1991) ("[C]laimant's verified claim contains a sworn statement by the company's general manager '[t]hat at no time did A.D.E. have any knowledge or reason to believe that the property in which it claims an interest was being used or would be used in violation of the law.'  The government has produced nothing to dispute the truth of that assertion.  * * *  The government has pointed to no facts that would entitle it to defeat A.D.E.'s claim, and A.D.E. is entitled to summary judgment . . . .").

The court must accept the non-movant's factual allegations, *ACLU v. NSA*, 493 F.3d 644, 691 (6th Cir. 2007) (concurrence) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)), *cert. denied*, – U.S. –, 128 S.Ct. 1334 (2008), and view the evidence in the light most favorable to the non-movant, giving it the benefit of all reasonable inferences, *see Fox v. Eagle Dist. Co., Inc.*, 510 F.3d 587, 592 (6th Cir. 2007) (Griffin, J.), but the court considers its evidence only to the extent that it would be admissible at trial. *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *13 (citations omitted).

Ultimately, "summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element to that party's case, and on which that party w[ould] bear the burden of proof at trial.'" *ARS*, 2008 WL 828112 at *13 (citing *Davison v. Cole Sewell Corp.*, 231 F. App'x 444, 447 (6th Cir. 2007) (quoting *Celotex*, 477 U.S. at 322)).[11] "As Chief Judge Bell has characterized the post-trilogy summary-judgment standard, '[w]hile preserving the constitutional right of civil litigants to a trial on meritorious claims, the courts are now vigilant to weed out fanciful, malicious, and unsupported claims before trial.'" *Ellis v. Kaye-Kibbey*, 581 F.

---

[11]

A trilogy of 1986 Supreme Court decisions "made clear that, contrary to some prior precedent, the use of summary judgment is not only permitted but encouraged in certain circumstances . . . ." *Collins v. Assoc'd Pathologists, Ltd.*, 844 F.2d 473, 475-76 (7th Cir. 1988). *Accord In re Fin. Federated Title & Trust, Inc.*, 347 F.3d 880 (11th Cir. 2003) (the trilogy "encourage the use of summary judgment as a means to dispose of factually unsupported claims.");

*Hurst v. Union Pacific Rail Co.*, 1991 WL 329588, *1 (W.D. Okla. 1991) ("This trilogy of cases establishes that factual and credibility conflicts are not necessarily enough to preclude summary judgment and encourage that a summary judgment be used to pierce the pleadings and determine if there is in actuality a genuine triable issue."), *aff'd*, 958 F.2d 1002 (10th Cir. 1992);

*Bowser v. McDonald's Corp.*, 715 F. Supp. 839, 840 (S.D. Tex. 1989) (the trilogy "encouraged federal district courts to use summary judgment more frequently and economically by changing the movant's burden of production . . . and by allowing qualitative review of evidence").

Supp.2d 861, 874 (W.D. Mich. 2008) (Maloney, C.J.) (quoting *Wilson*, 112 F. Supp.2d at 654).

## DISCUSSION

Taylor contends that Portinga's claim fails for three reasons: first, her comments did not address matters of public concern; second, there is no evidence showing the school terminated her because of comments she made about Taylor; and third, he is entitled to qualified official immunity.

1.    ELEMENT ONE - PROTECTED SPEECH
      Part One:  Has Portinga Shown a Genuine Issue as to Whether
      Her Comments Addressed Matters of Public Concern?

To establish a prima facie case of First Amendment retaliation under 42 U.S.C. § 1983, the government employee must demonstrate that (1) she was engaged in constitutionally protected speech, (2) she was subjected to an adverse action, and (3) the protected speech was a "substantial" or "motivating" factor in the adverse action.  *Farhat v. Jopke*, 370 F.3d 580, 588 (6th Cir. 2004) (citing *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003)).  Taylor concedes that termination constitutes an adverse action, so Portinga satisfies the second element.  Therefore, the propriety of summary judgment turns on whether Portinga can show a genuine issue on the first factor (constitutionally protected speech) and the third factor (proximate causation).

First, the court must ascertain whether the government employee's speech addressed a matter of public concern.  *Farhat*, 370 F.3d at 588 (citing *Connick v. Myers*, 461 U.S. 138, 143 (1983)).  Second, if the speech did address a matter of public concern, the court must decide whether the speech was protected, which it does by balancing the government employee's interests "'as a citizen, in commenting upon matters of public concern'" against "'the interest of the State, as an employer, in promoting the efficiency of the public services [sic] it performs through its employees.'" *Farhat*,

-15-

370 F.3d at 588 (quoting *Pickering v. Bd. of Ed.*, 391 U.S. 563, 568 (1968)).

If the State's interest outweighs the government employee's interest, the speech is not protected by the First Amendment in this context.  If the employee's interest outweighs the State's interest, the speech *is* protected by the First Amendment, and the analysis proceeds to the third step, where the court would determine whether the protected speech was a substantial or motivating factor in Taylor's decision to fire Portinga.  *Farhat*, 370 F.3d at 588 (citing *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003) (citing, *inter alia*, *Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 287 (1977)).

**In determining whether Portinga's speech addressed a matter of public concern, this court is guided by *Connick v. Myers*, 461 U.S. 138 (1983).**  There, an assistant prosecutor, upset over her pending transfer within the office, circulated a questionnaire among her colleagues soliciting their views on various issues, including "office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work on political campaigns."  *Connick*, 461 U.S. at 141.  The Supreme Court held that, of all the topics raised by the plaintiff's questionnaire, only pressure to work on political campaigns was a matter of public concern for purposes of a First Amendment retaliation claim:

> When employee expression cannot be fairly considered as relating to any matter of *political, social, or other concern to the community*, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment.

*Connick*, 461 U.S. at 146 (emphasis added).  By "any" matter of public concern, the Supreme Court conveyed that "the entire speech does not have to address matters of public concern, as long as some portion of the speech does so."  *Farhat*, 370 F.3d at 589 (quoting *Connick*, 461 U.S. at 147-48).

Whether Portinga's speech addressed a matter of public concern must be determined by the

-16-

content, form, and context of her statements as revealed by the whole record. *Farhat*, 370 F.3d at 589 (quoting *Connick*, 461 U.S. at 149). Synthesizing prior published Sixth Circuit decisions, *Farhat* provides useful rules of thumb for determining when speech addresses a matter of public concern. Most important, speech is of public concern if it involves "issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *Farhat*, 370 F.3d at 590 with n.5 (citing *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003) and *Banks v. Wolfe Cty. Bd. of Ed.*, 330 F.3d 888, 893 (6th Cir. 2003)).

The employee's motive for the speech is relevant, but not dispositive, in determining whether it addressed a matter of public concern. *Farhat*, 370 F.3d at 590-91 with n.7 (citing, *inter alia*, *Rodgers*, 344 F.3d at 600, and *Taylor v. Keith*, 338 F.3d 639, 645 (6th Cir. 2003) ("The inquiry is primarily . . . what the speaker intended to communicate through his statement, and not his reasons for speaking.")). Even if the employee were acting out of a private motive with no intent to air her speech publicly, it will be considered as addressing a matter of public concern if it relates to "matters of 'political, social, or other concern to the community,' as opposed to matters 'only of personal interest . . . .'" *Farhat*, 370 F.3d at 591 n.7 (quoting *Cockrel v. Shelby Cty. Sch. Dist.*, 270 F.3d 1036, 1052 (6th Cir. 2001) (quoting *Connick*, 461 U.S. at 146-49)) (other cites omitted). Ultimately, "the pertinent question is not *why* the employee spoke, but *what* he said." *Farhat*, 370 F.3d at 591 (emphasis in original).

Passing, fleeting, or occasional references to an arguably public matter do not elevate the speech to a matter of public concern where the "focus" or "point" of the speech advanced only a private interest. *Farhat*, 370 F.3d at 592-93 (citing, *inter alia*, *Rodgers*, 344 F.3d at 597-98; and *Taylor*, 338 F.3d at 645-46; and *Rahn v. Drake Ctr., Inc.*, 31 F.3d 407, 412-13 (6th Cir. 1994)). In

-17-

*Farhat*, for example, the Sixth Circuit held that a government employee's speech did not address matters of public concern merely because he made references to collusion and corruption which were "incidental" to the message conveyed.  *Farhat*, 370 F.3d at 593 (citations omitted).

> The thrust of Taylor's argument on the first element of the retaliation claim is that

> it is well established that mere complaints about your boss, absent allegations of corruption or other serious wrongdoing, do not rise to the level of protected speech. This is especially true when the statements are made only to a personal confidant [Bergh] with no attempt to disseminate the information to the public at large.

MSJ at 5.

Taylor relies heavily, and appropriately, on *Barnes v. McDowell*, 848 F.2d 725 (6ᵗʰ Cir. 1988), where our Circuit held that two employees had *not* addressed matters of public concern by complaining that (1) vending facilities operated by their employer, the Kentucky Bureau for the Blind, for its Business Enterprises Program, should be audited frequently, (2) the Bureau's failure to conduct frequent audits allowed some of the vendors to under-report their earnings by about $2 million per year, which resulted in a loss to the program and reflected poorly on the honest vendors, (3) two blind vendors in particular, who were close friends of one of the defendants, an Acting Director of the Bureau, were "grossly, openly, and notoriously" under-reporting their earnings, (4) the Bureau encouraged or condoned discrimination against totally-blind people in favor of partially-blind people regarding participation as vendors in the program, (5) the defendant Acting Director failed to discipline inefficient and incompetent employees or to support plaintiff Barnes in his efforts to do so, (6) the Bureau deserved higher appropriations from the legislature than it received or the defendant Acting Director was willing to request, and (7) the Acting Director failed to investigate allegations of the improper purchase of parts used in the program, in violation of State billing procedures.  *Barnes*, 848 F.2d at 728 n.4; *see also id.* at 730 n.7 (plaintiff Thompson describing the

instances of speech which he felt were mainly responsible for his termination).

Nonetheless, the *Barnes* panel held that the subject of the plaintiffs' speech was "less imbued with the public interest than that of the plaintiffs" in *Connick*, 461 U.S. 138 (1983), and several decisions within and outside our circuit which were held *not* to constitute speech on matters of public concern, such as *McMurphy v. City of Flushing*, 802 F.2d 191 (6th Cir. 1986). *See Barnes*, 848 F.2d at 730. The panel declared, "Just because the expenditure of public funds is tangentially implicated does not automatically entitle the expression to protection." *Barnes*, 848 F.2d at 730.

Significantly, the *Barnes* panel granted summary judgment even though it was "possible to read the allegations in the complaint as charging corruption in the agency, most notably on the part of [the Acting Director] and as charging discrimination by the agency against totally blind individuals." *Barnes*, 848 F.2d at 734. The panel held that while "speech disclosing public corruption is a matter of public interest," *id.* at 734, it was not enough for the plaintiff to rest on the allegations in his complaint. Rather, she "must present concrete evidence to support the allegation" that her speech disclosed public corruption "in order to survive summary judgment. The evidence need not be conclusive on the issues presented in the litigation, but it must sufficiently indicate the existence of facts which are disputed by the parties and which are material to the litigation to defeat the defendant's motion." *Barnes*, 848 F.2d at 734. As to plaintiff Thompson, the court held,

> While Thompson may have been justified in his beliefs that his section of the Business Enterprise Program did not receive enough of the operating budget, that the Program should have had a 24-hour repair deadline before he instituted one and that the wisdom and propriety of some of the Bureau's purchasing practices was questionable, *he presented no evidence linking any of these charges to corruption in the Bureau or in the Program.* Thompson's complaints appear to be nothing more than examples "of the quintessential employee beef: management has acted incompetently."

*Barnes*, 848 F.2d at 734-35 (quoting *Murray*, 741 F.2d at 438).

-19-

**Likewise, while Portinga may have been justified in believing that Taylor's practices were inefficient, inappropriate, or unfair, or even grounds for his termination, she presented no evidence linking those complaints to substantial corruption by Taylor or anyone else.**

As to Portinga's first instance of speech putatively on a matter of public concern, she did not allege that Taylor or anyone else received a kickback, or otherwise personally benefitted in an unlawful way, from the apparent error in the order or delivery of the table skirt or the decision to give the first table skirt to the elementary school rather than returning it to the supplier and paying a return fee. (The court is not prepared to hold that an allegation of illegality, corruption or *serious* impropriety is essential in every case for a finding of public concern, the cases do support the proposition that the presence of such allegations helps a plaintiff on the public-concern issue and the absence of such allegations does not help, as seen below in the discussion of how the Sixth Circuit's decision in *Banks* is distinguishable from our case.)

As to Portinga's statement that Taylor was wasting money on a defective table skirt while failing to order sufficient textbooks for students, she again charged only incompetence or shortsightedness, not corruption, and she admitted that she knew that textbooks were funded from a different budget than the school board's expenditures on items like the table skirts. Portinga also admitted that in her understanding, it was the high school principal, not the superintendent, who was responsible for ordering such textbooks. *See* MSJ Ex G (Second Portinga Dep Excerpt) at pp. 41-50. Nor has she disputed Taylor's statement that her complaint about physics textbooks stemmed from her personal concern over her daughter's class's textbooks, not a matter of public concern.

As to Portinga's alleged statement that Taylor spent time buying baseball tickets via the Internet on his office computer during work-hours, that constitutes an accusation of at most

arguably-lazy or inappropriate behavior, not corruption or wrongdoing that affects the public interest in any substantial way. *See Jackson v. Leighton*, 68 F.3d 903, 911 (6th Cir. 1999) ("A public employee's complaint that a coworker spends too much time at the water cooler does not become a matter of public concern simply because that coworker is paid by the state.").

As to Portinga's alleged statements to Bergh about Taylor's pay advance, by her own account she did not recall telling Bergh (or anyone else) that Taylor's pay advance was inappropriate, let alone corrupt or illegal. On the contrary, she testified that she did not think the advance was inappropriate. *See* MSJ Ex G (Second Portinga Dep Excerpt) at pp. 58-63.

As to Portinga's alleged complaint to Bergh regarding Taylor's officiating at sporting events, she does not allege that she told Bergh (or anyone else) that Taylor's officiating was corrupt or illegal. Moreover, she has not contested Taylor's statement that the school board authorized him to officiate at those events – a far cry from a corrupt or illegal practice of concern to the general citizenry in forming opinions about the functions and performance of its government schools.

As to Portinga's alleged complaints that Taylor was too frequently absent, that too is an allegation at most of incompetence or laziness, not corruption or illegality or much more than a complaint about her superior's performance, character, and work ethic. Again *see Jackson*, 68 F.3d at 911 ("A public employee's complaint that a coworker spends too much time at the water cooler does not become a matter of public concern simply because that coworker is paid by the state.").

In short, Portinga's speech to board member Bergh – and perhaps, allegedly, board member Muckel – charged incompetence and other unpleasant characteristics well short of corruption or illegality. And even when she complained about Taylor's decisions or practices that at-best indirectly implicated the use of taxpayer funds, she raised those concerns "only to amplify what are

at bottom complaints about [Taylor]'s job performance." *Feterle v. Chowdhury*, 148 F. App'x 524, 529 (6th Cir. 2005) (C.J. Boggs, Gibbons, D.J. Quist) (although aeronautics professor at Kent State University complained that co-worker's declining cognitive abilities and superior's alleged poor decisions threatened to compromise airport safety, those complaints did not address a matter of public concern, especially where they were communicated only to other government employees and concerned only the employee's own co-workers and supervisors) (citing *Brown v. City of Trenton*, 867 F.2d 318, 322 (6th Cir. 1989) (complaints about police management are not transformed into statements on matters of public concern merely because poor management of police could harm public safety)).

In addition to the content of Portinga's speech, the court places some weight on the fact that she spoke only to Bergh, who was an acknowledged personal friend of Portinga and her husband. Portinga remarks sarcastically, "Defendant cites no case support for the proposition that there is a 'friend' exception to Plaintiff's constitutionally protected free speech rights", P's Opp at 24, but she conveniently overlooks our Circuit's precedentially binding statement that whether speech addressed a matter of public concern must be determined by "the content, form, and *context* of her statements as revealed by the whole record." *Farhat*, 370 F.3d at 589 (quoting *Connick*, 461 U.S. at 149). (Portinga recognizes just that principle of Sixth Circuit law later on the same page, *see* P's Opp at 24.) The fact that board member Bergh was also a friend of Portinga's does not necessarily foreclose a finding that her statements to him addressed matters of public concern, and in some cases the record might lead the court to attribute no significance at all to the personal relationship between the government employee and the person to whom she complains.

But on this record, the court is permitted to consider the friendship as a factor tending to

answer that question in the negative, i.e., to find that she conveyed her complaints to Bergh solely or predominantly as customary "venting" to a friend.  After all, it is telling that Portinga admittedly did not convey any of her complaints about Taylor to *any* of the other six school board members – only the one board member who was her personal friend.  Nor has Portinga even alleged that she asked board member Bergh to convey her complaints and concerns to the other board members, or otherwise to take action to investigate, inquire, and monitor *in his role as a board member*.  Nor did she contact the local newspaper, television station, or radio station, whether through a "letter to the editor" or otherwise.  These facts seriously undermine Portinga's intimation that her "statements were made to a member of the School Board" *because* he was a member of the school board "with influence and a control . . . over the Superintend[e]nt of Schools", P's Opp at 24 and Ex R (Portinga Dep) at pp. 37-38), and Bergh's claim that he "understood that she was conveying the information being fully aware of that fact", *id.* (citing Ex CC, Bergh Aff ¶ 4).

**Lastly on this issue, Portinga relies heavily on *Banks v. Wolfe Cty. Bd. of Ed.*, 330 F.3d 888 (6th Cir. 2003) (N.D. Ohio D.J. Polster, joined by Gilman, J.), but that reliance is misplaced.**  Banks, a substitute teacher who was rejected for a full-time teaching job, started questioning the policies and procedures of the school board.  *Banks*, 330 F.3d at 890-91.  Banks spoke to several board members about the interviewing procedures that were or were not followed before the board hired one Evans instead of her, and she made formal written complaint to a state education agency on August 13 and October 9, 1998.  *Id.* at 891.  On October 13, 1998, Superintendent Butcher met with Banks and told her both orally and in writing that she was being transferred to the Family Resource Center.  *Id.*  Banks also alleged that after that time, the

-23-

defendants did not interview her for numerous jobs; the principal refused to forward her resume to other principals for open positions in their schools; and the board offered her a contract for 1999-2000 that did not include the expected 3% pay increase and an additional $600 boost.  *Id.*  In July 1999, Banks filed a § 1983 action asserting a First Amendment retaliation claim and a state-law whistleblower claim.  *Id.* at 892.

The defendants argued that Banks's speech did not primarily address matters of public concern because her complaint letters to the state agency consisted of nothing more than personal grievances, motivated by self-interest in obtaining a full-time, certified teaching position.  *Banks*, 330 F.3d at 893.  The district court, relying on *Chappel v. Montgomery Cty. Fire Protect. Dist. No. 1*, 131 F.3d 564 (6th Cir. 1997), granted summary judgment to the defendants.  *Banks*, 330 F.3d at 894.  The district court relied on *Chappel* for the proposition that "an employee's motivation for speaking could dominate the substance of the employee's speech, rendering the 'point' or 'communicative purpose' of the employee's speech merely a matter of personal concern."  *Id.*  The Sixth Circuit rejected that reasoning, stating as follows:

> [T]he district court apparently overlooked another portion of the *Chappel* holding: "Whether an employee's statement is predominated by 'the employee's personal interest qua employee' is primarily a content-based inquiry, not an exclusively motive-based inquiry." [*Chappel*, ] 131 F.3d at 575.

> Since *Chappel*, this court has held that the subjective intent of the speaker, while relevant, is not a controlling factor. [citations omitted]  * * *  We conclude that the district court erred by according too much significance to Banks' personal motivations.

> Because the district court focused on Banks's subjective motivation regarding the [state agency] complaint letters, it failed to recognize that the speech might be viewed as 'mixed speech' involving both personal and public matters.  Since 1983, this court has followed the Supreme Court's holding that the entirety of the employee's speech does not have to address matters of public concern, so long as some portion of the speech touches on a matter of public concern.

-24-

*Banks*, 330 F.3d at 894 (citing *Connick*, 461 U.S. at 149).

Portinga contends that like the plaintiff in *Banks*, she engaged in mixed speech, and as *Banks* held, "[m]ixed questions of private and public concern, where the employee is speaking both as a citizen as well as an employee, can be protected." *Banks*, 330 F.3d at 894 (citing *Vaughn Lawrenceburg Power Sys.*, 269 F.3d 703, 716 (6th Cir. 2001) and *Bonnell v. Lorenzo*, 241 F.3d 800, 812 (6th Cir. 2001) ("although aspects of Plaintiff's speech involve matters of personal interest where he is speaking regarding a personal grievance as an employee, his speech also involved matters of public interest such that Plaintiff is speaking as a concerned citizen")).

But *Banks* rested its determination, as each court must, on the facts of that case, and those facts are readily and dramatically distinguishable from ours. Significantly, Portinga spoke only to the one member of the school board who was her friend, not to the other six board members who had equal authority to investigate complaints about the performance or ethics of the superintendent, and she did not contact any other government official or agency. By contrast, Banks spoke with staff at the Kentucky Office of Education Accountability and filed two formal written complaints with that agency, which led the agency to conduct an on-site investigation and interview both the defendant superintendent and the members of the County Board of Education. *See Banks*, 330 F.3d at 891.

Another significant difference between *Banks* and our case is that Banks's complaints to the state agency alleged that the defendants were *breaking state law*. *See Banks*, 330 F.3d at 895 (Banks testified that while she had a personal motivation for contacting the state agency, she also "was concerned for our school system as a whole. I wanted the things that were taking place to stop that were not right, *that were went about illegally*.") (emphasis added). Banks' complaints included the

-25-

grave allegations that the defendants had *actually created and paid a position without Board approval, hired teachers who lacked the certification required by state law, and awarded jobs to favored individuals without even posting the jobs and interviewing candidates. See Banks*, 330 F.3d at 895-96.  In holding that Banks's speech was constitutionally protected, the panel emphasized that "public interest 'is near its zenith when ensuring that public organizations are being operated in accordance with the law'", *Banks*, 330 F.3d at 896 (quoting *Chappel*, 131 F.3d at 574), and that the defendants' alleged "failure to follow state law" by hiring teachers it knew to be unqualified "is a 'concern to the community'", *Banks*, 330 F.3d at 896-97 (citing *Perry*, 209 F.3d at 606).  By contrast, the superintendent conduct about which Portinga complained, even if "wrong" or against school district policies, did not amount to any substantial corruption or law-breaking.  *Banks* is of no avail to Portinga.

Because Portinga has not shown a genuine issue as to whether her speech addressed a matter of public concern within the meaning of *Connick* (U.S. 1983), *Banks* (6th Cir. 2003), and our other precedents, her speech was not protected under the First Amendment, and the inquiry ends there. *See Barnes v. McDowell*, 848 F.2d 725, 733 (6th Cir. 1988) ("If the plaintiff's speech did not address a matter of public concern, no further inquiry is necessary.") (citing *Rankin v. McPherson*, 483 U.S. 378, 382, 384-85 (1987)).  Specifically, the court need not and does not consider whether Portinga could pass the *Pickering v. Bd. of Ed.*, 391 U.S. 563 (1968) balancing test, *see Yohn v. Coleman*, 2009 WL 703202, *7 (E.D. Mich. Mar. 16, 2009) (discussing factors which court considers in applying *Pickering* test) (citing, *inter alia*, *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)); whether she has shown a genuine issue as to whether her speech was a substantial factor motivating

-26-

her termination; and whether she can show a genuine issue as to whether Taylor's stated reasons for firing her were pretexts for unlawful First Amendment retaliation. Likewise, because Portinga fails to state a claim for First Amendment retaliation, the court declines to consider whether Taylor is entitled to qualified official immunity based on the state of our precedents at the time he fired Portinga.

## ALLEGATION OF FABRICATED EVIDENCE

Portinga suggests that the defense intentionally fabricated or altered evidence. Portinga charges as follows,

> Seidner testified that she authored a memorandum dated April 13, 2006 [four days before Portinga's termination] purporting to substantiate directives from Defendant to Plaintiff which Plaintiff denies. Exhibit N, Memo from Ponter-Seidner to Taylor, 4/13/06, EA 0028; Exhibit AA, Pointer-Seidner Dep, p 55. This exhibit was originally produced by Defendant during Plaintiff's deposition, on June 17, 2008.

> The date of this memorandum is of arguably persuasive important because it is dated April 13, 2006, the day *immediately before* Plaintiff's employment termination, and purportedly substantiates a non-pretextual basis for the termination decision since it was delivered to Plaintiff *before* termination.

> However, Defendant unwittingly produced another version of this same memorandum earlier in this litigation, at the time of its Rule 26 Disclosure, showing an entirely different date on the same memorandum, June 15, 2006. Exhibit O, Memo from Seidner to Taylor, 6/15/06, BB0019. It would appear that the April 13, 2006 memorandum was predated to falsely substantiate a non-pretextual reason for termination.

P's Opp at 5 n.2 (paragraph breaks added) (emphasis in original). The court has compared the earlier-dated Seidner-to-Taylor memo, P's Opp Ex N, with the later-dated Seidner-to-Taylor memo, P's Opp Ex O.

The defense replies, plausibly, that the presence of the date "June 15, 2006" on the memo it produced during Rule 26 disclosures is attributable to a common feature of the Microsoft program,

presumably Microsoft Word,

> which includes an automatic date function.   The date on the document is
> automatically set to reflect the date the document is opened on the computer system.
> Every time the document is retrieved from the database and printed it will have a
> different date (i.e. the date printed).
>
> The most likely explanation for the two different dates is that someone was looking
> for a copy of the memorandum and decided to retrieve it from the computer system.
> When the document was printed the automatic date function changed the date.  There
> is no evidence to support plaintiff's conspiracy theory.  Moreover, the conspiracy
> theory only makes sense if defendant was extremely forgetful.  Anyone who went to
> the trouble of tampering with the document would have destroyed the original with
> the different date.

Def's Reply Br. at 7.  *See also id.*, Exhibit 1 (Affidavit of Lisa Pointer-Seidner dated Dec. 12, 2008)

¶¶ 5-6.

In any event, the parties' dispute over whether Business Manager Seidner really sent Taylor

a memo (about Portinga's failure to follow his directives) just days before he terminated her, does

not affect the court's analysis.   Portinga seeks to show that after firing her, Taylor had his

subordinates create a fake memo, dated before her termination, that provided additional good cause

(unrelated to her allegedly protected speech) for firing her.  If the court found Taylor created such

a fake memo, the court might conclude that there is a genuine issue of fact as to whether Taylor's

articulated lawful reasons for terminating Portinga were his *real* reasons, or just a pretext to retaliate

against her for protected speech.   But as discussed above, Portinga does not bear her burden of

showing that her statements to Bergh constituted constitutionally protected speech – first and

foremost because her speech did not address matters of public concern.  Thus the court never reaches

the pretext analysis.[12]

_____

[12]

For this same reason, the court need not consider other evidence and arguments that Portinga
submits in support of her allegation that Taylor's stated reasons for firing her were a pretext for

For the same reasons, the court's summary-judgment ruling is not affected by any suggestion that defendant Taylor deliberately destroyed or withheld part of his 2005-2006 performance evaluation, or that Taylor or someone else at his behest refrained from taking minutes (or destroyed the minutes) of a closed-session portion of the March 13, 2006 Board meeting regarding that evaluation. *See* P's Opp at 10, citing Ex H (Regular Bd. of Ed. Meeting agenda for March 13, 2006) and Ex I (Minutes of Apr. 10, 2006 Board meeting) (noting that Taylor's performance evaluation has been completed). Portinga charges, "No one can explain why Defendant's 2006 Annual Performance Evaluation is gone. Defendant was the Custodian of the Records for the District under his contract and under the law", P's Opp at 10-11 citing Ex J (Taylor Contract) and Ex S (Taylor Dep) at 183, and she theorizes that "[t]here could have been revealed criticisms of Defendant's performance pertaining to the issues raised by Ms. Portinga with Mr. Bergh", P's Opp at 10.[13] But what the board members or anyone else thought of Taylor's performance is not material to any of the elements of Portinga's First Amendment retaliation claim. Nor has Portinga shown how Taylor's 2005-2006 evaluation, or minutes of the March 13, 2006 closed-session of the Board, is

---

unlawful retaliation. For example, Portinga alleges that Taylor violated the District's policies regarding proposing termination and actually terminating an employee, e.g., by failing to discuss Portinga's deficiencies with her and give her a chance to rectify them; by failing to consult the District's attorney before deciding on disciplinary action against her; and by failing to inform the Board President that he was contemplating firing Portinga, thereby depriving the Board President of the opportunity to make a report to the Board if he so chose. *See* P's Opp at 11-12, citing Ex L (Staff Discipline Policy for Support Staff) and Ex BB (Portinga Aff) ¶¶ 6-8 and Ex U (Board President Davidhizar Dep) at 4 to 5 and 13.

[13]

Portinga also notes Board member Jeffrey Zimont's testimony that he destroyed his school system records about one week before being served with a subpoena for production of documents in this case, P's Opp at 11 n.3, citing Ex V (Zimont Dep) at 12 through 15. She does not allege, however, that Zimont destroyed those records because Taylor or Seidner directed him to do so, or because Zimont hoped or intended that the unavailability of his records would harm her case.

potentially relevant to Taylor's qualified-immunity defense.  *See* Taylor's Reply at 7-8.

**In closing,** the court recognizes Portinga's strongly held belief that her termination was unfair and unwarranted by her performance and the court intimates no opinion on that belief.  But as the Supreme Court has cautioned,

> Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable.

*Connick*, 461 U.S. at 146 (internal citations omitted).

## ORDER

After considering the parties' briefs and hearing oral argument:

The defendant's motion for summary judgment [document # 31] is **GRANTED**.

The complaint is **DISMISSED**.

The case is **TERMINATED** and **CLOSED**.

This is a final and appealable order.

**It is so ordered this 2nd day of April,  2009.**


<u>/s/ Paul L. Maloney</u>                    
Honorable Paul L. Maloney
Chief United States District Judge